Slip Op. 20-147

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HUSTEEL CO., LTD., | |
|      Plaintiff, | |
| and | Before: Jennifer Choe-Groves, Judge |
| SEAH STEEL CORPORATION, HYUNDAI STEEL COMPANY, and NEXTEEL CO., LTD., | Consol. Ct. No. 19-00107 |
|      Consolidated Plaintiffs, | |
| v. | |
| UNITED STATES, | |
|      Defendant, | |
| and | |
| WHEATLAND TUBE COMPANY, | |
|      Defendant-Intervenor. | |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final results in the 2016–2017 administrative review of the antidumping duty order on circular welded non-alloy steel pipe from the Republic of Korea.]

Dated:  October 19, 2020

Donald B. Cameron, Julie C. Mendoza, R. Will Planert, Brady W. Mills, Mary S. Hodgins, Eugene Degnan, and Sabahat Chaudhary, Morris, Manning & Martin LLP, of Washington, D.C., for Plaintiff Husteel Co., Ltd.

Jeffrey M. Winton and Amrietha Nellan, Winton & Chapman PLLC, of Washington, D.C., for Consolidated Plaintiff SeAH Steel Corporation.

Robert G. Gosselink and Jarrod M. Goldfeder, Trade Pacific PLLC, of Washington, D.C., for Consolidated Plaintiff Hyundai Steel Company.

J. David Park, Henry D. Almond, Daniel R. Wilson, Leslie C. Bailey, and Kang Woo Lee, Arnold & Porter Kaye Scholer LLP, of Washington, D.C., for Consolidated Plaintiff NEXTEEL Co., Ltd.

Joshua E. Kurland, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, of Washington, D.C., for Defendant United States.  With him on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and L. Misha Preheim, Assistant Director.  Of counsel on the brief was Elio Gonzalez, Attorney, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement & Compliance.

Roger B. Schagrin, Elizabeth J. Drake, and Christopher T. Cloutier, Schagrin Associates, of Washington, D.C., for Defendant-Intervenor Wheatland Tube Company.

Choe-Groves, Judge:  Plaintiff Husteel Co., Ltd. ("Husteel") and Consolidated Plaintiffs SeAH Steel Corporation ("SeAH"), Hyundai Steel Company ("Hyundai Steel"), and NEXTEEL Co., Ltd. ("NEXTEEL") (collectively, "Plaintiffs") bring this consolidated action challenging the U.S. Department of Commerce's ("Commerce") final results in the 2016–2017 administrative review of the antidumping duty order on circular welded non-alloy steel pipe ("CWP") from the Republic of Korea ("Korea").  See Circular Welded Non-Alloy Steel Pipe From the Republic of Korea ("Final Results"), 84 Fed. Reg. 26,401 (Dep't Commerce June 6, 2019) (final results of administrative review; 2016–2017), PD 180, and accompanying Issues & Decision Mem. for the Final Results of the 2016–2017 Admin. Review of the Antidumping Duty Order on Circular Welded Non-Alloy Steel Pipe from the Republic of Korea[1] ("Final IDM") (May 30, 2019), ECF No. 20-5, PD 173.  Before the court are Plaintiffs' Rule 56.2 motions for judgment on the agency record.  Mot. Pl. [SeAH] J. Agency R., ECF No. 26; Br. [SeAH] Supp. Rule 56.2 Mot. J. Agency

---

[1] Citations to the administrative record reflect the public record ("PD") document numbers.

R., ECF No. 26-1 ("SeAH Br.")[2]; Pl. [Husteel]'s Mot. J. Agency R., ECF No. 27; Pl. [Husteel]'s

Br. Supp. Mot. J. Agency R., ECF No. 27-2 ("Husteel Br."); Rule 56.2 Mot. J. Agency R.

Consol. Pl. [NEXTEEL], ECF No. 28; Mem. Supp. Consol. Pl. [NEXTEEL]'s Rule 56.2 Mot. J.

Agency R., ECF No. 28-2 ("NEXTEEL Br.")[3]; Consol. Pl.'s Rule 56.2 Mot. J. Agency R., ECF

Nos. 29, 30; Mem. Supp. Rule 56.2 Mot. Consol. Pl. [Hyundai Steel] J. Agency R., ECF Nos.

29-1, 30-1 ("Hyundai Br.").  For the following reasons, the court sustains in part and remands in

part the Final Results.


### ISSUES PRESENTED

The court reviews the following issues:

1.  Whether Commerce's particular market situation adjustment to the cost of production

    when conducting a sales-below-cost test is in accordance with the law;

2.  Whether Commerce's particular market situation determination is in accordance with

    the law;

3.  Whether Commerce's differential pricing methodology is in accordance with the law;

    and

4.  Whether Commerce's treatment of Hyundai Steel (Pipe Division) as a separate entity

    is supported by substantial evidence in the record.

---

[2] SeAH incorporates Husteel's and Hyundai Steel's arguments by reference as to particular
market situation and differential pricing, and does not make any independent arguments.  See
SeAH Br. 3.

[3] NEXTEEL incorporates Husteel's and Hyundai Steel's arguments by reference as to particular
market situation and does not make any independent arguments.  See NEXTEEL Br. 4.

## BACKGROUND

Commerce invited requests for administrative review of the antidumping duty order of CWP from Korea for the period covering November 1, 2016 to October 31, 2017.  Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation, 82 Fed. Reg. 50,620, 50,621 (Dep't Commerce Nov. 1, 2017) (opportunity to request administrative review), PD 1.  Hyundai Steel and Defendant-Intervenor Wheatland Tube Company ("Wheatland") timely requested review.  Hyundai Steel's Req. for Admin. Review, PD 3 (Nov. 28, 2017); Wheatland's Req. for Admin. Review ("Wheatland's Req."), PD 4 (Nov. 30, 2017).  Wheatland included Hyundai Steel (Pipe Division) in its list of proposed respondents and did not separately include Hyundai Steel.  Wheatland Req. 3.

Commerce initiated this administrative review.  Initiation of Antidumping and Countervailing Duty Administrative Reviews ("Initiation Notice"), 83 Fed. Reg. 1329, 1331 (Dep't Commerce Jan. 11, 2018), PD 18.  Hyundai Steel and Hyundai Steel (Pipe Division) were identified separately in the Initiation Notice.  Id.  Commerce selected Husteel and Hyundai Steel as mandatory respondents.  Resp't Selection Mem. 5, PD 19 (Feb. 20, 2018).

Wheatland submitted a particular market situation allegation on July 12, 2018.  See Letter Re: Rejection of Wheatland's July 12, 2018 Submission 1, PD 82 (Aug. 20, 2018).  Commerce rejected this submission for failing to comport with regulation requirements and relate to the instant period of review.  Id. at 1–2.

Wheatland re-submitted the particular market situation allegation.  Wheatland's Re-Submitted Allegation, PD 88–104 (Aug. 27, 2018).  Citing Commerce's determinations of a particular market situation in Korea in previous administrative reviews covering the period of

review from 2015 to 2016[4], Wheatland asserted that the particular market situation continued to

exist during the instant 2016 to 2017 period of review.  Id. at 1–2.  In support of its allegation,

Wheatland attached several documents, including: Wheatland's October 16, 2017 allegation

submitted in Circular Welded Non-Alloy Steel Pipe From the Republic of Korea; 2015–2016; a

World Trade Organization report that "indicates the distortions Commerce has previously found

to exist in Korea have not gone away;" a Korean government document purporting to

demonstrate strategic alliances affecting the Korean pipe market; and a Commerce document

"indicating that Chinese imports remained a significant factor in the Korean steel market."  Id. at

3–4.  Wheatland argued that the allegation need not be restricted to the instant period of review.

Id. at 2 ("Commerce's letter of August 20, 2018 also asks for clarification of 'whether and how

the information submitted in support of the [particular market situation] allegation is relevant to

the current POR' or the provision of 'additional information that is relevant to this POR.'  This

request is misguided.").  Analogizing particular market situation determinations to non-market

economy determinations, Wheatland asserted that once Commerce makes a particular market

---

[4] Wheatland cited Commerce's final results in Circular Welded Non-Alloy Steel Pipe From the Republic of Korea, 83 Fed. Reg. 27,541 (Dep't Commerce June 13, 2018) (final results of administrative review; 2015–2016); Welded Line Pipe From the Republic of Korea, 83 Fed. Reg. 33,919 (Dep't Commerce July 18, 2018) (final results of administrative review; 2015–2016); and Certain Oil Country Tubular Goods From the Republic of Korea, 83 Fed. Reg. 17,146 (Dep't Commerce Apr. 18, 2018) (final results of administrative review; 2015–2016).  Wheatland's Re-Submitted Allegation 1 n.1.  Commerce's particular market situation determination in the final results in Circular Welded Non-Alloy Steel Pipe From the Republic of Korea; 2015–2016 was remanded as unsupported by substantial evidence.  Hyundai Steel Co. v. United States, 43 CIT __, __, 415 F. Supp. 3d 1293, 1299 (2019).  Commerce's particular market situation determination in the final results in Welded Line Pipe From the Republic of Korea; 2015–2016 was remanded as unsupported by substantial evidence.  Husteel Co. v. United States, 44 CIT __, __, 426 F. Supp. 3d 1376, 1392 (2020).  Commerce's particular market situation determination in the final results in Certain Oil Country Tubular Goods From the Republic of Korea; 2015–2016 was remanded twice as unsupported by substantial evidence.  NEXTEEL Co. v. United States, 43 CIT __, __, 392 F. Supp. 3d 1276, 1288 (2019); NEXTEEL Co. v. United States, 44 CIT __, __, Slip Op. 20-69, at *21 (May 18, 2020).

situation determination, the respondents in subsequent administrative reviews should be required "to show that something had changed such that a re-examination of Commerce's prior findings is merited." Id. at 2–3. Wheatland contended that the burden was on the respondents to submit evidence of changes in the factors that formed the basis of Commerce's prior determinations regarding a particular market situation in Korea, namely: hot-rolled steel coil subsidies, Chinese hot-rolled steel coil imports, strategic alliances between Korean companies, and electricity subsidies. See id. at 3. Commerce accepted Wheatland's re-submission. Letter Setting Deadline for Factual Information, PD 107 (Sept. 14, 2018).

Commerce calculated preliminary dumping margins of 8.47% for Hyundai Steel and the all-others rate of 10.56% for Hyundai Steel (Pipe Division). Circular Welded Non-Alloy Steel Pipe From the Republic of Korea ("Preliminary Results"), 83 Fed. Reg. 63,619, 63,620 (Dep't Commerce Dec. 11, 2018) (preliminary results of administrative review; 2016–2017), PD 143. Commerce determined that a particular market situation existed in Korea that distorted the cost of production of CWP and applied an upward adjustment to the cost of production based on subsidy rates of hot-rolled steel coil. Decision Mem. for the Prelim. Results of Antidumping Duty Admin. Review: Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: 2016–2017 ("Prelim. DM") 9–16, PD 135 (Dec. 3, 2018) (citing Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea, 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016) (final affirmative determination), as amended, 81 Fed. Reg. 67,960 (Dep't Commerce Oct. 3, 2016)). Commerce conducted a sales-below-cost test and disregarded certain below-cost sales. Prelim. DM IX, F, 2–3 (Dep't Commerce Dec. 3, 2018). Commerce calculated normal value from the remaining above-cost home market sales for mandatory respondents Hyundai Steel and Husteel. Id. at 16.

In the <u>Final Results</u>, Commerce used the methodology applied in the <u>Preliminary Results</u> and modified the amount of the particular market situation adjustment to the cost of production according to the subsidy amount determined in <u>POSCO v. United States</u>, 43 CIT __, 378 F. Supp. 3d 1348 (2019).  Final IDM 3.  Commerce assigned weighted-average dumping rates of 10.91% for Husteel, 8.14% for Hyundai Steel, and the all-others rate of 9.53% for NEXTEEL and Hyundai Steel (Pipe Division).  <u>Final Results</u>, 84 Fed. Reg. at 26,402.

<b>JURISDICTION AND STANDARD OF REVIEW</b>

The court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), which grant the court authority to review actions contesting the final results of an administrative review of an antidumping duty order.  The court will uphold Commerce's determinations unless they are unsupported by substantial record evidence, or otherwise not in accordance with the law. 19 U.S.C. § 1516a(b)(1)(B)(i).

<b>DISCUSSION</b>

**I.    Particular Market Situation**

**A.    Governing Law**

Commerce determines antidumping duties by calculating the amount by which the normal value of subject merchandise exceeds the export price or the constructed export price for the merchandise.  19 U.S.C. § 1673.  When reviewing antidumping duties in an administrative review, Commerce must determine: (1) the normal value and export price or constructed export price of each entry of the subject merchandise, and (2) the dumping margin for each such entry. <u>Id.</u> § 1675(a)(1)(B), (a)(2)(A).  The statute dictates the steps by which Commerce may calculate normal value "to achieve a fair comparison" with export price or constructed export price.  <u>Id.</u> § 1677b(a).

First, the statute specifies the methodology for Commerce to determine which sales should be considered and disregarded in calculating normal value. Normal value is "the price at which the foreign like product is first sold . . . in the exporting country . . . in the ordinary course of trade." Id. § 1677b(a)(1)(B)(i). Sales outside the ordinary course of trade are excluded from normal value. "Ordinary course of trade" is defined in Section 1677(15) as excluding: (1) sales made at less than the cost of production, and (2) sales that cannot be compared properly with the export price or constructed export price due to a particular market situation. Id. § 1677(15)(A), (C). To determine whether "sales . . . have been made at prices that represent less than the cost of production," the statute directs Commerce to conduct the sales-below-cost test. Id. § 1677b(b)(1). The cost of production is defined by statute to include the cost of materials and processing, amounts for selling, general, and administrative expenses, and the cost of all containers and expenses incidental for shipment. Id. § 1677b(b)(3). Sales that Commerce determines, by application of the sales-below-cost test, were made at prices below the cost of production or that Commerce determines were made in a particular market situation, are outside the ordinary course of trade and are disregarded from the calculation of normal value. See id. § 1677b(b)(1), (a)(1)(B)(i). "Whenever such sales are disregarded, normal value shall be based on the remaining sales of the foreign like product in the ordinary course of trade." See id. §§ 1677b(a)(1)(B)(i), (b)(1); 1677(15)(A), (C).

Second, when using market prices to determine normal value, Commerce may make certain adjustments to the remaining home market prices. The statute lists authorized adjustments for incidental shipping, delivery expenses, and direct taxes; and for differences between the subject merchandise and foreign like products in quantity, circumstances of sale, or level of trade. Id. § 1677b(a)(6), (7).

Third, when using home market sales for normal value, if Commerce cannot determine the normal value of the subject merchandise based on home market sales, then Commerce may use qualifying third-country sales or a constructed value as a basis for normal value.  Id. § 1677b(a)(4), (a)(1)(B)(ii), (b)(1).  Constructed value represents: (1) the cost of materials and fabrication or other processing of any kind used in producing the merchandise; (2) the actual amounts incurred and realized for selling, general, and administrative expenses, and for profits, in connection with the production and sales of a foreign like product, in the ordinary course of trade, for consumption in the foreign country; and (3) the cost of packing the subject merchandise.  Id. § 1677b(e).  When calculating constructed value, if Commerce determines that a particular market situation exists "such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, [then] [Commerce] may use . . . any other calculation methodology."  Id.

> **B.** **Unauthorized Adjustment to the Cost of Production for the Sales-Below-Cost Test**

For purposes of determining whether sales were made at less than cost, in this case Commerce adjusted the reported costs of production of hot-rolled steel coil, a primary CWP input, based on a determination that a particular market situation in Korea continues to distort the cost of hot-rolled steel coil.  Final IDM 6; Prelim. DM 16.  Defendant argues that "the statutory language and structure support Commerce's interpretation that it has authority to perform a cost-based particular market situation analysis when conducting the sales-below-cost test in a case like this one."  Def.'s Resp. Pls.' Mots. J. Agency R. ("Def. Opp'n") 16, ECF No. 33.  Plaintiffs counter that the statute does not permit a particular market situation adjustment in the course of determining whether home market sales were made at less than the cost of production.  Hyundai Br. 12; Husteel Br. 27.  Wheatland contends that upon a determination that a particular market

situation distorts the cost of production, Commerce is authorized in Section 1677b(e)(1) to use

"any other calculation methodology."  Resp. Br. Def.-Intervenor [Wheatland] 22, ECF No. 34.

As this Court has held repeatedly, the statute does not authorize a particular market situation

adjustment to the cost of production when Commerce applies the sales-below-cost test to

determine which home market sales to exclude from the calculation of normal value.  See Saha

Thai Steel Pipe Pub. Co. v. United States, 43 CIT __, __, 422 F. Supp. 3d 1363, 1368–70 (2019);

Husteel Co. v. United States, 44 CIT __, __, 426 F. Supp. 3d 1376, 1383–89 (2020); Borusan

Mannesmann Boru Sanayi Ve Ticaret A.Ş. v. United States ("Borusan"), 44 CIT __, __, 426 F.

Supp. 3d 1395, 1411–12 (2020).

   Here, Commerce applied an adjustment to the cost of production calculation set forth in

Section 1677b(b)(3) for purposes of the sales-below-cost test pursuant to Section 1677b(b)(1).

See Prelim. DM 9–16; Final IDM 3.  Commerce relies mistakenly on Section 504 of the Trade

Preferences Extension Act of 2015 ("TPEA"), Pub. L. No. 114-27, 129 Stat. 362, for the

authority to adjust the cost of production for the sales-below-cost test.  Commerce explains that:

> The term "ordinary course of trade," defined in section 771(15) of the Act, includes
> situations in which "the administering authority determines that the [particular
> market situation] prevents a proper comparison of normal value with the export
> price or constructed export price."  Thus, where a [particular market situation]
> affects the [cost of production] of the foreign like product because it distorts the
> cost of inputs, it is reasonable to conclude that such a situation may prevent a proper
> comparison of the export price with normal value based on home market prices just
> as it would when normal value is based on [constructed value].  The claim that an
> examination of a [particular market situation] for purposes of the sales-below-cost
> test goes beyond the plain language of the Act fails to consider that the provision
> at issue, section 773(e) of the Act, specifically includes the term "ordinary course
> of trade."  Thus, the definition of that term, again, found in section 771(15) of the
> Act, is integral to that [particular market situation] provision.  Accordingly, we
> disagree with the argument that Commerce cannot analyze a [particular market
> situation] claim in determining whether a company's comparison-market sale
> prices were below cost, and therefore, are outside the "ordinary course of trade."

Final IDM 7.  Commerce exercised "discretion to use 'any other calculation methodology' if

costs are distorted by a [particular market situation], including for the purposes of [cost of production] . . . ." Id. at 8.  In other words, Commerce made a particular market situation adjustment to costs based on Section 1677b(e).  Commerce asserts that the cost-based particular market situation analysis and alternative calculation methodology set forth in Section 1677b(e) are available whether Commerce bases normal value on home market sales or constructed value. Commerce and Defendant also assert that the sales-below-cost test set forth in Section 1677b(b)(1), by relying on the phrase "ordinary course of trade" defined in Section 1677(15)(C) as excluding sales made in a particular market situation, authorizes Commerce to conduct the particular market situation analysis and adjust costs based on Sections 1677b(b)(1) and 1677(15)(C).  Final IDM 7; Def. Opp'n 16.

Section 504 of the TPEA amended the statutory provisions governing constructed value. The amendment authorized Commerce to use alternative cost methodologies when computing constructed value after making a particular market situation determination.  The amended language provides:

> [F]or purposes of paragraph (1) [in reference to calculating constructed value] if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority [Commerce] may use another calculation methodology under this subtitle or any other calculation methodology.

19 U.S.C. § 1677b(e).  In other words, the amended statute gives Commerce discretion to adjust the cost of production calculation methodology when determining constructed value if Commerce determines that a particular market situation exists.  See id.  Commerce cannot rely on Section 1677b(e) when, as here, Commerce bases normal value on home market sales.  No part of the statute allows Commerce to use any other methodology when market sales are used for normal value.  See Saha Thai Steel Pipe Pub. Co., 43 CIT at __, 422 F. Supp. 3d at 1368–70;

Husteel Co., 44 CIT at __, 426 F. Supp. 3d at 1383–89; Borusan, 44 CIT at __, 426 F. Supp. 3d

at 1411–12.  The "any other methodology" language is reserved solely for when normal value is

determined by constructed value.  Husteel Co., 44 CIT at __, 426 F. Supp. 3d at 1388.

As to Sections 1677b(b)(1) and 1677(15)(C), Defendant argues that Section

1677b(b)(1)'s reference to the phrase "ordinary course of trade" authorizes Commerce to

conduct a cost-based particular market situation analysis and adjustment in the course of the

sales-below-cost test.  Def. Opp'n 16.  Section 1677b(b)(1) provides:

> (b) Sales at less than cost of production.
>
> (1) Determination; sales disregarded.  Whenever the administering authority has reasonable grounds to believe or suspect that sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production of that product, the administering authority shall determine whether, in fact, such sales were made at less than the cost of production.  If the administering authority determines that sales made at less than the cost of production—
>
> > (A) have been made within an extended period of time in substantial quantities, and
> >
> > (B) were not at prices which permit recovery of all costs within a reasonable period of time,
>
> such sales may be disregarded in the determination of normal value.  Whenever such sales are disregarded, normal value shall be based on the remaining sales of the foreign like product in the ordinary course of trade.  If no sales made in the ordinary course of trade remain, the normal value shall be based on the constructed value of the merchandise.

19 U.S.C. § 1677b(b)(1).  Section 1677b(b)(1) sets forth the sales-below-cost test based on the

calculation specified in Section 1677b(b)(3) to confirm that sales were made at less than the cost

of production.  Within Section 1677b(b) for "Sales at less than cost of production," the sub-

section 1677b(b)(1) for "Determination; sales disregarded" authorizes Commerce to disregard

those below-cost sales as outside the ordinary course of trade.  Id. § 1677b(b)(1).  The plain

language of the reference to "ordinary course of trade" provides that sales on which normal value

are based must be in the ordinary course of trade.  Id. § 1677b(b)(1), (a)(1)(B)(i).  Sales made at

less than cost, between affiliates, and in a particular market situation are excluded from the

definition of "ordinary course of trade" in Section 1677(15).  Thus, sales in those three

categories are disregarded for purposes of calculating normal value based on market sales.

Nothing in the statute grants Commerce the authority to modify the sales-below-cost test to

permit a particular market situation analysis or adjustment, and the specificity of the sales-below-

cost test leaves no ambiguity.  See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253–54 (1992)

("[C]ourts must presume that a legislature says in a statute what it means and means in a statute

what it says there.").

        In sum, although Section 504 of the TPEA amended Section 1677b(e) for "Constructed

Value" to grant Commerce discretion to use an alternative calculation methodology, and Section

1677(15) for "Ordinary course of trade" to grant Commerce an additional ground on which it

may disregard sales from the normal value calculation when using home market sales, the

Section 504 amendment did not amend Section 1677b(b), which sets out the calculation of the

cost of production for the sales-below-cost test to determine whether and which sales should be

disregarded as outside the ordinary course of trade when normal value is based on home market

sales.  "[W]here 'Congress includes particular language in one section of a statute but omits it in

another section of the same Act, it is generally presumed that Congress acts intentionally and

purposely in the disparate inclusion or exclusion.'"  Thomas v. Nicholson, 423 F.3d 1279, 1284

(Fed. Cir. 2005) (quoting Russello v. United States, 464 U.S. 16, 23 (1983)).  Thus, the statute

authorizes Commerce to disregard certain sales when basing normal value on home market sales,

or to use an alternative calculation methodology upon a cost-based particular market situation

determination when basing normal value on constructed value.

Here, however, Commerce applied a cost-based particular market situation adjustment for

purposes of the sales-below-cost test of Section 1677b(b)(1), while basing normal value on home

market sales.  The statute does not authorize Commerce to adjust the cost of production as an

alternative calculation methodology when using normal value based on home market sales under

Section 1677b(e) as claimed by Commerce.  The statute also does not authorize Commerce to

adjust the cost of production for purposes of the sales-below-cost test under Sections 1677b(b)(1)

and 1677(15)(C) as claimed by Commerce.  Section 1677b(e) applies only when Commerce

bases normal value on constructed value.  Because Commerce based normal value on home

market sales here, not constructed value, Section 1677b(e) is inapplicable.  Nothing in Sections

1677b(b)(1) and 1677(15)(C) authorizes Commerce to adjust the cost of production for the sales-

below-cost test.  The court concludes, therefore, that Commerce's particular market situation

adjustment to the cost of production is not in accordance with the law.  Because Commerce may

not adjust the cost of production when using normal value based on home market sales, the court

does not consider the lawfulness or reasonableness of Commerce's adjustment calculation.  See

Husteel Br. 29–33; Hyundai Br. 20–28.

### C.     Unauthorized Particular Market Situation Determination

Commerce determined that a particular market situation in Korea distorting the cost of

producing CWP continued during the period of review, based on the cumulative impact of

"(1) subsidization of Korean hot-rolled steel products by the Korean government; (2) the

distortive pricing of unfairly traded Chinese hot-rolled steel coil; (3) strategic alliances between

Korean hot-rolled steel coil suppliers and Korean CWP producers; and (4) distortive government

control over electricity prices in Korea."  Prelim. DM 12; Final IDM 11–16.  Commerce

determined that "the circumstances present in the previous review . . . have remained largely

unchanged and . . . due to the cumulative impact of those factors, a particular market situation

exists in Korea which distorts the cost of production of CWP."  Final IDM 11.  Plaintiffs argue

that the record does not support Commerce's particular market situation determination, as

Commerce relied substantially on record documents from prior administrative reviews that this

court found did not support the particular market situation determinations in those prior

administrative reviews.  Husteel Br. 15–16; Hyundai Br. 11.

      Here, Commerce based its particular market situation determination on distortions in the

cost of hot-rolled steel coil, a primary CWP input.  Final IDM 6.  Commerce explained:

> Section 504 of the TPEA added the concept of [particular market situation] in the
> definition of the term "ordinary course of trade," for purposes of constructed value
> under section [1677b(e)], and through these provisions for purposes of the [cost of
> production] under section [1677b(b)(3)].  Section 773(e) of the TPEA states that
> "if a particular market situation exists such that the cost of material and fabrication
> or other processing of any kind does not accurately reflect the cost of production in
> the ordinary course of trade, the administering authority may use another
> calculation methodology under the subtitle or any other calculation methodology."
> Thus, under section 504 of the TPEA, Congress has given Commerce the authority
> to determine whether a [particular market situation] exists within the foreign market
> from which the subject merchandise is sourced and to determine whether the cost
> of materials, fabrication, or processing of such merchandise fail to accurately reflect
> the [cost of production] in the ordinary course of trade.

Id.  In other words, Commerce made the particular market situation determination under Section

1677b(e) based on the assertion that Section 1677b(e)'s reference to "ordinary course of trade"

incorporates Section 1677b(e) into the cost of production calculation in Section 1677b(b)(3).

      As discussed in the previous section, Section 1677b(e) applies expressly when Commerce

bases normal value on constructed value.  19 U.S.C. § 1677b(e).  Nothing in the statute can be

read to authorize a cost-based particular market situation determination when Commerce bases

normal value on home market sales.  The statute does not provide for a cost-based particular

market situation analysis when using home market sales to calculate normal value.  Commerce

made an unlawful particular market situation cost-based determination in this case, while basing

normal value on home market sales.  The court concludes that Commerce's cost-based particular

market situation determination is not in accordance with the law, and the court thus does not

consider whether Commerce's particular market situation determination is supported by

substantial evidence in the record.

## II.     Differential Pricing Methodology

Husteel and SeAH contend that Commerce's differential pricing methodology is not in

accordance with the law due to an adverse World Trade Organization ("WTO") Appellate Body

Report.  See Husteel Br. 33–35 (citing Appellate Body Report, United States – Anti-Dumping

and Countervailing Measures on Large Residential Washers from Korea, WTO Doc.

WT/DS464/AB/R (adopted Sept. 26, 2016) ("AB Report")).  The WTO Appellate Body

concluded that the differential pricing methodology applied by the United States violates Article

2.4.2 of the Agreement on the Implementation of Article VI of the General Agreement on Tariffs

and Trade of 1994.  See id. at 34; AB Report ¶ 1.2.  Specifically, the Appellate Body faulted: (1)

the method as ineffectual to reveal patterns across purchasers, regions, and time periods; (2)

application of the average-to-transaction ("A-to-T") method to all sales instead of only the sales

identified as part of an identified pattern; (3) "zeroing" of negative dumping margins even under

the A-to-T method; and (4) lack of explanation as to why the average-to-average method or

transaction-to-transaction method would fail to account for differences in the export prices that

form an identified pattern.  Husteel Br. 34 (citing AB Report ¶¶ 5.34–36, 6.2–3, 5.177, 6.7, 6.9–

10, 5.153, 5.171, 5.75–76, 6.6.).

Commerce ordinarily uses an average-to-average comparison ("A-to-A") of "the weighted average of the normal values [of subject merchandise] to the weighted average of export prices (and constructed export prices) for comparable merchandise" when calculating a dumping margin.  See 19 U.S.C. § 1677f-1(d)(1)(A); 19 C.F.R. § 351.414(c)(1).  The statute allows Commerce to compare instead the weighted average of normal values to the export prices of individual transactions for comparable merchandise ("A-to-T") when (1) Commerce observes "a pattern of export prices . . . for comparable merchandise that differ significantly among purchasers, regions, or periods of time" and (2) "[Commerce] explains why such differences cannot be taken into account using [the A-to-A methodology]."  19 U.S.C. § 1677f-1(d)(1)(B)(i)–(ii).  In contrast to the A-to-A method, which may mask dumped sales at low prices by averaging them with sales at higher prices, the A-to-T method allows Commerce to "identify a merchant who dumps the product intermittently—sometimes selling below the foreign market value and sometimes selling above it."  Apex Frozen Foods Private Ltd. v. United States, 862 F.3d 1337, 1342 (Fed. Cir. 2017) (internal quotation marks and citation omitted).  Commerce may apply the A-to-T methodology on the same basis in administrative reviews as in antidumping investigations.  See JBF RAK LLC v. United States, 790 F.3d 1358, 1364 (Fed. Cir. 2015).

In Apex Frozen Foods Private Ltd. v. United States ("Apex Frozen Foods"), 862 F.3d 1337, 1342–43 (Fed. Cir. 2017), Commerce applied a two-step differential pricing analysis to determine whether there was a pattern of significant price differences warranting an A-to-T comparison.  First, Commerce applied the Cohen's $d$ test, which Commerce uses to determine whether application of the A-to-T method may be warranted to a portion or all of a respondent's sales.  Id. at 1343.  For the respondent whose sales passed the Cohen's $d$ test with more than

66%, Commerce decided that application of the A-to-T method to all sales would be warranted.

Id.  Second, Commerce applied the "meaningful difference" test, which is a comparison of the

weighted-average margin computed using the A-to-A method with the weighted-average margin

computed using the A-to-T method.  Id. at 1344–45, 1343.  For the A-to-T method, Commerce

applied its practice of "zeroing," by which Commerce gives a value of zero to negative dumping

margins (sales at non-dumped prices) and averages only positive dumping margins (sales at

dumped prices) to "reveal[ ] masked dumping."  Id. at 1342 (quoting Union Steel v. United

States, 713 F.3d 1101, 1109 (Fed. Cir. 2013) ("When examining individual export transactions,

using the [A-to-T] comparison methodology, prices are not averaged and zeroing reveals masked

dumping.")).  Commerce explained that the A-to-A method could not account for the pattern of

price differences because the difference between the two margins was "meaningful."  Id. at 1343

(citation omitted).  The statute is silent on how Commerce should identify a pattern of differing

prices and how Commerce should determine that the A-to-A method cannot account for

differences, and the U.S. Court of Appeals for the Federal Circuit has upheld Commerce's

differential pricing methodology as a "reasonable implementation of the statutory scheme."  Id.

at 1346.

     As in Apex Frozen Foods, Commerce applied its two-step differential pricing

methodology here.  Final IDM 22.  Commerce applied the Cohen's *d* test, which the U.S. sales

for Husteel and Hyundai Steel passed with over 66%.  Id.  Commerce also compared the

weighted-average dumping margins calculated by the A-to-A method and the A-to-T method

with zeroing, and determined that the 25% difference was "meaningful."  Id.; see id. at 31.

Commerce applied the A-to-T method to all of Husteel's and Hyundai Steel's U.S. sales.  Id. at

23.  Commerce used the same differential pricing methodology steps and analysis here as was

upheld in <u>Apex Frozen Foods</u>.  The court concludes that the differential pricing methodology applied by Commerce in this case is in accordance with the law.

The court is not persuaded by Husteel's argument that the court should alter its conclusion due to the adverse WTO Appellate Body Report.  "WTO decisions are 'not binding on the United States, much less [ ] court[s].'"  <u>Corus Staal BV v. Dep't of Commerce</u>, 395 F.3d 1343, 1348 (Fed. Cir. 2005) (quoting <u>Timken Co. v. United States</u>, 354 F.3d 1334, 1344 (Fed. Cir. 2004)).  The Uruguay Round Agreements Act did not amend or modify any law of the United States, and when the Uruguay Round Agreements Act conflicts with United States law, United States law controls.  19 U.S.C. § 3512(a).

"The conduct of foreign relations is committed by the Constitution to the political departments of the Federal Government."  <u>Corus Staal BV</u>, 395 F.3d at 1349 (quoting <u>United States v. Pink</u>, 315 U.S. 203, 222–23 (1942)).  The United States Trade Representative has the authority to adopt a WTO ruling with the consultation of congressional committees and agency notice-and-comment rulemaking.  19 U.S.C. § 3533(g)(1).  But unless and until implementation, Commerce cannot amend, rescind, or otherwise modify a policy per a WTO ruling, and courts "will not attempt to perform duties that fall within the exclusive province of the political branches."  <u>Id.</u>; <u>Corus Staal BV</u>, 395 F.3d at 1349.

The court finds no merit in Husteel's argument.  Husteel does not assert that the WTO ruling has been adopted through statutory procedure and relies only on the existence of the WTO Appellate Body ruling and compliance panel order.  <u>See</u> Husteel Br. 33–35.  The WTO ruling has no effect on litigation in United States courts without statutory implementation.  <u>See</u> 19 U.S.C. § 3512(a)(1).  Because the court concludes that Commerce's differential pricing methodology is reasonable under the relevant statutes and has been upheld by this Court and the

U.S. Court of Appeals for the Federal Circuit, and the court's conclusion is not altered by the

WTO Appellate Body Report, the court sustains Commerce's differential pricing methodology as

in accordance with the law.

<h3 style="text-align:center;">III.   Separate Entity Treatment of Hyundai Steel (Pipe Division)</h3>

Hyundai Steel contests Commerce's treatment of Hyundai Steel (Pipe Division) as a

separate entity based on a purported error by Commerce.  Hyundai Br. 29.  Defendant argues that

the court should not consider the argument because Hyundai Steel failed to exhaust its

administrative remedies.  Def. Opp'n 40.  Defendant contends that the determination requires an

affiliation and collapsing analysis, which has not been conducted by Commerce.  Id. at 40–41.

Commerce has the duty "to determine dumping margins as accurately as possible."  See

NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (internal quotation

marks and citation omitted).  "[A] remand to correct clerical errors is especially appropriate

where the CIT is already remanding for other reasons."  Cemex, S.A. v. United States, 133 F.3d

897, 904 (Fed. Cir. 1998) (explaining NTN Bearing Corp., 74 F.3d at 1208).

The court observes that the record appears to support a determination that Hyundai Steel

(Pipe Division) is a component of Hyundai Steel's Ulsan factory, not a separate entity.  In its

request for administrative review, Wheatland did not include Hyundai Steel, but included

Hyundai Steel (Pipe Division) at 12 Hunneung-No, Seocho-Gu, Seoul, South Korea, in its list of

requested respondents.  Wheatland Req. 3.  In its Section A Questionnaire Response, Hyundai

Steel listed its "Seoul Head Office" at the same address of 12 Hunneung-No, Seocho-gu, Seoul,

West Pavilion of Hyundai-Kia Motors Building.  Hyundai's Section A Questionnaire Response,

PD 30–42, Ex. A-3 (Mar. 20, 2018).  Hyundai Steel's subsequent questionnaire responses show

that the "Pipe Division" is a component of Hyundai Steel's Ulsan factory.  Hyundai's Section B,

C, and D Questionnaire Responses at D-28, PD 62 (Apr. 16, 2018) ("Hyundai Steel segregates

FY 2017 COM into factories and, in the case of the Ulsan factory, into divisions to identify the

COM of the Pipe Division.") ("Hyundai Steel shows adjustments to account for non-subject

products produced in the Pipe Division at the Ulsan plant.").  Moreover, Commerce

acknowledged the error implicitly by not citing record documents supporting treatment of

Hyundai Steel and Hyundai Steel (Pipe Division) as separate entities.

      The court notes that, contrary to Defendant's assertion, an affiliation and collapsing

analysis is inapplicable here.  The relevant regulation directs Commerce to conduct an affiliation

and collapsing analysis to determine whether to treat "two or more affiliated producers as a

single entity where those producers have production facilities for similar or identical products . . .

and the Secretary concludes that there is a significant potential for the manipulation of price or

production."  19 C.F.R. § 351.401(f); see also Prosperity Tieh Enter. Co. v. United States, 965

F.3d 1320, 1323 (Fed. Cir. 2020).  Here, it is apparent to the court that the facts do not support an

affiliation and collapsing inquiry into whether Hyundai Steel and Hyundai Steel (Pipe Division)

are separate producers who should be treated as a single entity based on a potential for the

manipulation of price or production.  To the contrary, the court notes that the record seems to

support the opposite conclusion that a single entity, Hyundai Steel, was treated inadvertently and

inaccurately as two separate entities, Hyundai Steel and Hyundai Steel (Pipe Division).  Because

the court remands for other reasons, and in the interest of accuracy, the court remands for

Commerce to reconsider in accordance with this opinion whether Hyundai Steel and Hyundai

Steel (Pipe Division) should be treated as a single entity.

**CONCLUSION**

      The court concludes that Commerce's cost-based particular market situation

determination and subsequent adjustment are not in accordance with the law.  The court sustains

Commerce's differential pricing methodology as in accordance with the law.  The court remands

for Commerce's reconsideration of treatment of Hyundai Steel and Hyundai Steel (Pipe

Division) as a single entity based on the record.

Accordingly, it is hereby

**ORDERED** that the Final Results are remanded for Commerce to remove its cost-based

particular market situation adjustment and recalculate the relevant margins without an

adjustment to the cost of production; and it is further

**ORDERED** that Commerce should reconsider treatment of Hyundai Steel and Hyundai

Steel (Pipe Division) as a single entity; and it is further

**ORDERED** that this action will proceed per the following schedule:

1. Commerce must file the remand redetermination on or before November 23, 2020;

2. Commerce must file the administrative record on or before December 11, 2020;

3. Comments in opposition to the remand redetermination must be filed on or before
   January 11, 2021;

4. Comments in support of the remand redetermination must be filed on or before
   February 11, 2021; and

5. The Joint Appendix must be filed on or before February 25, 2021.


                                                        /s/ Jennifer Choe-Groves
                                                     Jennifer Choe-Groves, Judge


Dated:   October 19, 2020
             New York, New York